UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

INTEL CORPORATION,
Plaintiff,
vs. Case No. 2:16-cv-00804-SPC-MRM

INTRUITY CORPORATION,
Defendant.

**MOTION TO DISMSS INTEL CORPORATION'S COMPLAINT WITH SUPPORTING MEMORANDUM OF POINTS AND AUTHORITIES**

Defendant hereby moves the Court to dismiss plaintiff's Complaint in its entirety for failure to state a claim pursuant to Federal Rule of Civil Procedure 1 2(b)(6), for the reasons more fully set forth in defendants' accompanying memorandum of points and authorities. It is acknowledged, through the filing the recent filings of a similar litigation in a different jurisdiction, that Intruity Corporation has taken a large portion of an argument from a previous litigation responding to an almost identical set of claims and allegations against yet another very small business entity.

In a similar fashion, Plaintiff sued an alleged infringer in an effort to unfairly monopolize a word that is commonly used in the English language. In an effort to seek justice, Intruity Corporation, with its very limited resources

consciously scoured the multitude of similar litigations for similar arguments and legal basis to incorporate in its initial dispositive brief in an effort to efficiently and quickly resolve litigation that could be viewed as frivolous and substantiated only as a result of the grossly unbalanced footing the parties are placed in this litigation.

In the future, as directed by the Court, Defendant shall prepare future motions with strict adherence to originality.

Respectfully submitted,

Dated: March 10, 2017

By: /s/ Steven K. Teuber
Steven K. Teuber
Florida Bar No. 14790
Teuber Law, Pllc
1375 Jackson Street, Suite 201
Fort Myers, FL 33901
(239) 288-4210 TEL
(239) 288-4211 FAX
steuber@teuberlaw.com

# TABLE OF CONTENTS

TABLE OF CONTENTS .......... iii

SUMMARY OF THE ARGUMENT .......... 8

INTRODUCTION AND FACTUAL OVERVIEW .......... 10

LEGAL ARGUMENT .......... 16

PLAINTIFF'S ALLEGATIONS SOUNDING IN TRADEMARK INFRINGEMENT FAIL TO STATE CLAIMS FOR WHICH RELIEF CAN BE GRANTED .......... 16

A. Legal standard for dismissal under Fed. R. Civ. P. 12(b)(6) .......... 16

B. The Court should take judicial notice of dictionary definitions of the word "intel" .......... 18

C. First and Second Cause of Action claims both fail "ultimate test" .......... 20

D. Defendant's of the word "intel" in its plain English sense is not use of the INTEL trademark .......... 24

E. Any use by defendant's of plaintiff's mark is an example of a non-actionable generic meaning in different contexts .......... 27

F. Plaintiff has failed adequately to plead facts amounting to a plausible claim of likelihood of confusion. .......... 32

G. The fame of defendant's mark does not enhance the plausibility of its allegations of a likelihood of confusion because defendant's use of the word "intel" is not a "competing mark" .......... 39

H. Plaintiff has failed to state a claim that defendant's use of the word "intel" is likely to dilute its INTEL mark .......... 41

CLAIMS 4 AND 5: STATE LAW CLAIMS .......... 43

CONCLUSION .......... 43

## TABLE OF CITATIONS

**Cases**

Academy of Motion Picture Arts and Sciences v. Network Solutions, 989 F. Supp. 1276 (C.D. Cal. 1997) ............................................................24, 25
AMF, Inc. v. Sleekcraft Boats, 599 F.3d 341 (9th Cir. 1979)............22, 31, 35
Anti- Monopoly, Inc. v. Gen. Mills Fun Group, 611 F.2d 296 (9th Cir.1979) 27
Ashcroft v. Iqbal, 129 S.Ct. 1937 (2009) ......................................................17
Avery Dennison Corp. v. Sumpton, 189 F.3d 868 (9th Cir. 1999).................. 7
B. V.D. Licensing Corp. v. Body Action Design, Inc., 846 F.2d 727 (Fed. Cir. 1988) ..........................................................................................................18
Bell Atl. Corp. v. Twombly, 550 U.S. 544 (2007).........................................17
Bell Atlantic v. Twombly, 127 S. Ct. 1955 (2007) .....................................9, 16
Brookfield Communications, Inc. v. West Coast Entertainment Corp., 174 F.3d 1036 (9th Cir. 1999) ........................................................................................34
California Cooler, Inc. v. Loretto Winery, Ltd., 774 F.2d 1451 (9th Cir. 1985) ...............................................................................................................8, 33
Century 21 Real Estate v. Sandlin ..................................................................19
Clegg v. Cult Awareness Network, 18 F.3d 752, 754-55 (9th Cir. 1994) .......16
Cose v. Getty Oil Co., 4 F.3d 700, 705 (9th Cir. 1993) .................................17
Electronic Data Systems Corp. v. EDSA Micro Corp., 23 USPQ2d 1460, 1463 (TTAB 1992)...........................................................................................37
Epstein v. Washington Energy Co., 83 F.3d 1136, 1140 (9th Cir.1996) .........16
Estate of P.D. Beckwith, Inc. v. Comm'r of Patents, 252 U.S. 538, 545-46, 40 S.Ct. 414, 64 L.Ed. 705 (1920) ..................................................................33
Illinois High School Ass'n v. GTE Vantage, Inc., 99 F.3d 244 (7th Cir. 1996)

..........................................................................................................30
In re Graphics Processing Units Antitrust Litig., 527 F. Supp. 2d 1011 (N.D. Cal. 2007)........................................................................................16
Information Resources Inc. v. X*Press Information Services, 6 USPQ2d 1034 (TTAB 1988)....................................................................................37
Interactive Prods. Corp. v. a2z Mobile Office Solutions, Inc., 326 F.3d 687, 695 (6th Cir. 2003)....................................................................................25
Jada Toys, Inc. v. Mattel, Inc., 518 F.3d 628 (9th Cir. 2008) .............20, 40, 42
Kenner Parker Toys Inc. v. Rose Art Industries, Inc., 963 F.2d 350, 353 (Fed. Cir. 1992) ........................................................................................38
L.L. Bean, Inc. v. Drake Publishers, Inc., 811 F.2d 26, 29 (1st Cir.1987) ......27
Lucasfilm, Ltd. v. High Frontier, 622 F. Supp. 931, 969 (D.D.C. 1985) ........29
March Madness Athletic Ass 'n, L.L.C. v. Netfire, Inc., 310 F. Supp. 2d 786 (N.D. Tex. 2003) ...............................................................................30
Mattel, Inc. v. MCA Records, Inc., 296 F.3d 894 (9th Cir. 2002) ............27, 30
Mendiondo v. Centinela Hosp. Med. Ctr., 521 F.3d 1097, 1104 (9th Cir. 2008) ..........................................................................................................17
Miller Brewing Co. v. G. Heileman Brewing Co., 561 F.2d 75, 80-81 (7th Cir.), cert. denied, 434 U.S. 1025 (1978) ..........................................................18
Murray v. Cable Nat. Broadcasting Co., 86 F.3d 858 (9th Cir. 1996).......20, 35
New Kids on the Block v. News America Publ’g, Inc., 971 F.2d 302 (9th Cir. 1992) ...................................................................................................20, 25
Octocom Systems, Inc. v. Houston Computers Services Inc., 918 F.2d 937, 16 USPQ2d 1783 (Fed. Cir. 1990)..................................................................37
Original Appalachian Artworks Inc. v. Streeter, 3 USPQ2d 1717 (TTAB 1987)

..........................................................................................................39
Papasan v. Allain, 478 U.S. 265, 286 (1986)................................................16
Pirone v. MacMillan, Inc., 894 F.2d 579, 583 (2d Cir. 1990).........................25
Prestonettes, Inc. v. Coty, 264 U.S. 359, 368 (1924).....................................25
Road Dawgs Motorcycle Club of U.S., Inc. v. Cuse Road Dawgs, Inc., 2009 WL 3790183, 16 at n. 64 ((N.D.N.Y. 2009) .............................................18
Rodeo Collection, Ltd. v. West Seventh, 812 F.2d 1215, 1217 (9th Cir.1987) ..........................................................................................................35
Sanders v. Kennedy, 794 F.2d 478, 481 (9th Cir. 1986).................................16
Sunset House Distributing Corp. v. Coffee Dan's Inc., 240 Cal. App. 2d 748, 753 (1966)..........................................................................................24
Team Cent. Inc. v. Xerox Corp., 606 F. Supp. 1408, 1413 (D.C. Minn. 1985) ..........................................................................................................18
Toho Co. v. Sears, Roebuck & Co., 645 F.2d 788, 793 (9th Cir. 1981)..........24
Union Carbide Corp. v. Ever-Ready Inc., 531 F.2d 366 (7th Cir. 1976).....8, 33
University of Notre Dame du Lac v. J. C. Gourmet Food Imports Co., Inc., 703 F.2d 1372, 217 USPQ 505 (Fed. Cir. 1983)...............................................39
Viacom International Inc. v. Komm, 46 U.S.P.Q.2d 1233 (T.T.A.B. February 05, 1998) ....................................................................................29, 31
Visa Int'l Serv. Ass'n v. JSL Corp., 2010 WL 2559003 (9th Cir. 2009) ..20, 41
Wilshire Westwood Assoc. v. Atlantic Richfield Corp., 881 F.2d 801, 803 (9th Cir. 1989) ..............................................................................................17
Yankee Publ'g, Inc. v. News Am. Publ'g, Inc., 809 F.Supp. 267, 276 (S.D.N.Y.1992) .......................................................................................27

**Statutes**

15 U.S.C. § 1114(1)(a) .......... 24

*15 U.S.C. § 1114(a)* .......... 19

15 U.S.C. § 1125(a) .......... 19

15 U.S.C. § 1125(a)(1) .......... 24

15 U.S.C. § 1125(c) .......... 40

15 U.S.C. § 1125(c)(2)(B) .......... 41

15 U.S.C. § 1127 .......... 25

Fed. R. Civ. P. 8(a)(2) .......... 16

Fed. R. Civ. P. 12(b)(6) .......... 16

Fed. R. Evid. 201 (b)(2) .......... 17

**Treatises**

4 J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition (4th ed.2004) § 12:3 .......... 29

4 J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition (4th ed.2004) § 23:41 .......... 33

**MEMORANDUM OF POINTS AND AUTHORITIES**

**SUMMARY OF THE ARGUMENT**

Defendant INTRUITY CORPORATION summarizes its argument in that the Lanham Act imposes liability upon any person who (1) uses an infringing mark in interstate commerce, (2) in connection with the sale or advertising of goods or services, and (3) such use is likely to cause confusion or mislead consumers. *15 U.S.C. § 1114(1)(a)*. The defining essence of the Lanham Act is to protect a plaintiff's trademark from third parties from capitalizing on the goodwill of the mark holder. See *Avery Dennison Corp. v. Sumpton*, 189 F.3d 868, 880 (9th Cir. 1999) ("commercial use under the Federal Trademark Dilution Act requires the defendant to be using the trademark as a trademark, capitalizing on its trademark status"). While the defendant has incorporated the word 'intel' into the compound phrase AGENCYINTEL , the word "intel" is being used in its plain English meaning (intelligence) along with other words in those phrases as one. "[When a] mark is a composite term . . . its validity is not judged by an examination of its parts. Rather, the validity of a trademark is to be determined by viewing the trademark as a whole. See *Union Carbide Corp. v. Ever-Ready Inc.*, 531 F.2d 366, 379 (7th Cir.), cert. denied,

429 U.S. 830, 97 S.Ct. 91, 50 L.Ed.2d 94 (1976). "Words which could not individually become a trademark may become one when taken together." *Id.* See also *California Cooler, Inc. v. Loretto Winery, Ltd.*, 774 F.2d 1451, 1455 (9th Cir. 1985).

This combination of words is particularly true when the second word is a common noun and the preceding work is the adjective describing, or narrowing, the breadth of the noun. For example, the Library of Congress has a website of stories on the military, "Experiencing War – Military Intel: The Inside Story" where it explains:

> Here are stories of Military Intelligence (or "Intel," as insiders call it), the secret weapon of any country's war effort. Every veteran has his or her own war, and each is custodian of a unique story and memories. At the Veterans History Project, we treasure the personal narratives sent to us by veterans from all wars.
>
> *See as* ***TEUBER DECLARATION, EXHIBIT A*** *–*
>
> *Library of Congress, October 20, 2006, https://www.loc.gov/vets/stories/ex-war-intel.html*

Plaintiff Intel Corp. cannot, therefore, proffer a plausible suggestion that Defendant INTRUITY CORPORATION is using the English word 'intel' as a

trademark and capitalizing upon any fame or goodwill of the INTEL mark. Intel Corporation must do more than recite the mere elements of the claim; Intel Corporation must "provide the grounds of [its] entitlement to relief" and allege conduct that is conceivable and "plausible." *Bell Atlantic v. Twombly*, 127 S. Ct. 1955, 1959 (2007) (citations omitted). Intel Corp.'s claim, therefore, must ultimately fail.

## INTRODUCTION AND FACTUAL OVERVIEW

The Complaint filed in this matter by Intel Corporation is a standard compilation used repeatedly across the country against a host of companies that endeavor to use the common abbreviation of the noun "intelligence" without any regard to the application or use. The claims by the Plaintiff focus on the allegation that the defendant, Intruity Corporation, has infringed Intel Corporation's INTEL trademarks through the use of the mark AGENCYINTEL in association with its sale and support of its single product, an industry specific CRM[1] software. AGENCYINTEL is an industry specific management program that provides the tools to track policies, manage commissions, business related

1 CRM (customer relationship management) software is a category of software that covers a broad set of applications and software designed to help businesses manage customer data and customer interaction, access business information, automate sales, marketing and customer support and also manage employee, vendor and partner relationships. Typically, CRM software is used in the enterprise, however many products scale to a business of any size.

documents, and employee agents in the insurance business. Defendant uses the word "intel" word in the English language for "intelligence," usually used in the sense of reconnaissance and analysis regarding areas of special interest, in defendant's application, specifically to the efficiency and operation of an insurance agency. Defendant's mark has nothing to do with INTEL chips, Intel Corp. or its business. Similar uses abound in the public today.

The recent blockbuster movie, Jason Bourne, released last year uses in the movie a similarly named software for its government employees to catch Jason Bourne. As shown in **TEUBER DECLARATION, EXHIBIT B**, a software application "IntelBase" is searched for information in the movie. While the font is almost identical to that of Plaintiff, nary a moviegoer would confuse this software program to be related to the Plaintiff in any more fashion than Defendant's AgencyIntel software for insurance agency management would be confused with the Plaintiff's products.

Intel Corporation is, admittedly, the well-known computer chip giant whose INTEL trademark is one of the world's best known for technology. *Complaint* ¶ *8-11*. It is alleged that Intel Corporation optimizes data storage and analysis for many industries, including but not limited to insurance agencies

*Complaint* ¶*3-11*, however, it fails to allege that it uses its trademarks, intends to use them, or is likely to use them in connection with the insurance agency market or any management software related to the insurance agency market. Optimizing data storage and data storage analysis is not an attribute of defendant's software program. Plaintiff fails to identify any resemblance in software technology, solutions, focus or market to that of defendant.

No allegation is made in the Complaint that defendant is offering a software program, consulting services respecting technology, computers, or anything having to do with Intel Corporation or for what its INTEL brand is known. The Complaint also omits the explanation as to why defendant might "use" a trademark associated with computer chips and related goods and services in connection with an insurance agency customer relationship management software system focusing on agent deployment, insurance market leads, and team collaboration. The reason for this is that Intel Corporation chooses to ignore a very significant fact: That the word "intel" used in defendant's marks has nothing to do with INTEL chips, Intel Corporation, or its business. Rather, "intel" is a word in the English language— albeit via slang—for "intelligence," usually used in the sense of reconnaissance and analysis regarding areas of special interest. It's not all about Intel Corporation.

As set forth below, once the Court takes—as the law provides that it should—judicial notice of the universe of dictionary and other reference and popular media definitions for the word "intel," and "intelligence", the meritless nature of the Complaint becomes painfully clear. Thus Merriam-Webster's online dictionary reports a single, solitary definition for the word "intel": "Function: abbreviation [Definition:] intelligence." Further, Merriam-Webster's online dictionary reports that the first definition for "intelligence" is (1) the ability to learn or understand or to deal with new or trying situations (2) the ability to apply knowledge to manipulate one's environment or to think abstractly as measured by objective criteria. re **TEUBER DECLARATION, EXHIBIT C**. Journalists, analysts, and others in a position to write or talk about "intel" do so with the full understanding of how the public understands the word. Thus, no less a standard-setter than the Associated Press has, in the last few days alone, repeatedly used the word to report about the government's intelligence agencies, special areas of information, and new or trying situations including a headline reading "Trump Embraces Ex-Top Obama **Intel** Official" **TEUBER DECLARATION, EXHIBIT D** (emphasis added). Another headline from the New York Daily News used the word "intel" on December 12, 2016 in the title of the story

"*Trump: I don't have to get daily* ***intel*** *briefs because I'm smart*" that ran in the online and print versions of its publication. **TEUBER DECLARATION, EXHIBIT E** (emphasis added).

Further examples of such usage abound. On December 10, 2016, the Charlotte Observer was reprinting an Associate Press article entitled "*Trump team challenges* ***intel*** *on Russian election influences*". **TEUBER DECLARATION, EXHIBIT F** (emphasis added). Similarly, in a National Review article entitled "Deep in the Shallows" and reviewing the recent film "Avatar," the author writes:

> Thus equipped, and supervised by an ornery scientist named Grace (Sigourney Weaver, having fun), he sets out to infiltrate the local alien clan in the hopes of making peace—or, failing that, in the hopes of bringing useful military **intel** back to his superiors.

**TEUBER DECLARATION, EXHIBIT G** (emphasis added). On the opposite end of the political spectrum—and merely utilizing a small fraction of publicly-recorded uses of the term "intel", the following usage comes via television commentator Chris Matthews:

> MATTHEWS: Yes. Well, how would you possibly pick up **intel** on a few guys get together with a kid like this? They recruit him or he joins them. They give him what he needs in terms much weaponry. He is already indoctrinated, or self-indoctrinated. He already has a point of view. How could a big intelligence

> worldwide network pick up on such a small situation like that, Tyler and then Bob?

**TEUBER DECLARATION, EXHIBIT H** (emphasis added). Finally, last August, a no less a competent source than the Washington Post headlined an article "*He was one of the most respected* ***intel*** *officers of his generation . Now he's leading "Lock Her Up" chants"*. It is unequivocally clear that nobody reading this article believed that one of Plaintiff's corporate officers was being identified in this story.

**TEUBER DECLARATION, EXHIBIT I** (emphasis added). The indisputably standard definition of the word "intel" provides a completely logical basis for understanding defendant's choices of terminology. Such a definition likewise provides a far more plausible basis than the conclusory allegations set forth in the Complaint and that defendants would conceivably have anything to gain by using the name of a computer chip manufacturer to describe their insurance agency management software regarding lead tracking, commissions, and insurance form generation.

As stated previously, Merriam-Webster's online dictionary reports a single, solitary definition for the word "intel": "Function: abbreviation [Definition:] intelligence." The various other exhibits from the aforementioned briefing

evidence use of the term "intel" for "intelligence" as completely accepted in journalistic usage. Intel Corp. would, however, have a word, which happens to be the same word as its trademark, operate as a prohibition against anyone else from using that word in an unrelated, unconfusing way. Intel Corp. not only wants to own the trademark INTEL, but the English language use of the word "intel" as well. No one else may utilize that word as any part of a trademark—ever. The law does not allow such a grant of proprietary rights. For this reason, and for many others—including the fact that plaintiffs cannot plausibly, even by dint of the allegations of the Complaint, be regarded as competitors; and that plaintiff's dilution claims fail to state a cognizable claim on multiple grounds as well—the Court should swiftly end this adventure in gross intellectual property overreaching and dismiss the Complaint of Intel Corporation as a matter of law.

## LEGAL ARGUMENT

### PLAINTIFF'S ALLEGATIONS SOUNDING IN TRADEMARK INFRINGEMENT FAIL TO STATE CLAIMS FOR WHICH RELIEF CAN BE GRANTED

#### A. Legal standard for dismissal under Fed. R. Civ. P. 12(b)(6)

A motion to dismiss under *Fed. R. Civ. P. 12(b)(6)* tests the "legal sufficiency" of the claims alleged in the complaint. *In re Graphics Processing*

*Units Antitrust Litig*., 527 F. Supp. 2d 1011, 1018 (N.D. Cal. 2007). A motion to dismiss is properly granted under Fed. R. Civ. P. 12(b)(6) where the pleadings fail to state a claim upon which relief can be granted. The complaint is construed in the light most favorable to the non-moving party and all material allegations in the complaint are taken to be true. *Sanders v. Kennedy*, 794 F.2d 478, 481 (9th Cir. 1986). The court is not, however, required to accept legal conclusions cast in the form of factual allegations if those conclusions cannot reasonably be drawn from the facts alleged. *Clegg v. Cult Awareness Network*, 18 F.3d 752, 754-55 (9th Cir. 1994) (citing *Papasan v. Allain*, 478 U.S. 265, 286 (1986)). Mere "conclusory allegations of law and unwarranted inferences are insufficient to defeat a motion to dismiss for failure to state a claim." *In re Graphics Processing Units,* supra, 527 F. Supp. 2d at 1018 (citing *Epstein v. Washington Energy Co.*, 83 F.3d 1136, 1140 (9th Cir.1996)). Even under the liberal pleading standard of *Fed. R. Civ. P. 8(a)(2)*, a plaintiff must do more than recite the elements of the claim and must "provide the grounds of [its] entitlement to relief." *Bell Atlantic v. Twombly*, 127 S. Ct. 1955, 1959 (2007) (citations omitted). In addition, the pleading must not merely allege conduct that is conceivable; the allegations must also be plausible. *Id.* at 1974. To dismiss for failure to state a claim pursuant to Fed. R. Civ. P. 12(b)(6), the court

must ultimately determine that "the complaint lacks a cognizable legal theory or sufficient facts to support a cognizable legal theory." *Mendiondo v. Centinela Hosp. Med. Ctr.*, 521 F.3d 1097, 1104 (9th Cir. 2008). To survive a Rule 12(b)(6) motion to dismiss, the plaintiff must allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). This "facial plausibility" standard requires the plaintiff to allege facts that add up to "more than a sheer possibility that a defendant has acted unlawfully." *Ashcroft v. Iqbal*, 129 S.Ct. 1937, 1949 (2009). While courts do not require "heightened fact pleading of specifics," a plaintiff must allege facts sufficient to "raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 544, 555. This burden was not met by the Plaintiff in this matter.

### B. The Court should take judicial notice of dictionary definitions of the word "intel"

Fed. R. Evid. 201 (b)(2) permits the Court to take judicial notice of facts that are "not subject to reasonable dispute in that it is . . . (2) capable of accurate and ready determination by resort to sources whose accuracy cannot be reasonably questioned." It is proper to take judicial notice of dictionary definitions. *Wilshire Westwood Assoc. v. Atlantic Richfield Corp.*, 881 F.2d 801, 803 (9th Cir. 1989); *Cose v. Getty Oil Co.*, 4 F.3d 700, 705 (9th Cir. 1993).

"To that end, dictionaries and encyclopedias may be consulted" in determining trademark issues and, in particular, in assessing genericness. *B. V.D. Licensing Corp. v. Body Action Design, Inc.*, 846 F.2d 727, 728 (Fed. Cir. 1988); *Team Cent. Inc. v. Xerox Corp*., 606 F. Supp. 1408, 1413 (D.C. Minn. 1985) (citing *Miller Brewing Co. v. G. Heileman Brewing Co.*, 561 F.2d 75, 80-81 (7th Cir.), cert. denied, 434 U.S. 1025 (1978) (relying heavily on dictionary to find that "light" or "lite" was generic term for low-calorie beer and noting propriety of judicial notice of common usage of the English language to determine whether a use is generic)); see also *Road Dawgs Motorcycle Club of U.S., Inc. v. Cuse Road Dawgs, Inc.*, 2009 WL 3790183, 16 at n. 64 ((N.D.N.Y. 2009) (reference to online dictionary).

In all these cases, the question of genericness was resolved by reference to standard reference works proffered by parties in competition with the senior mark holder. In contrast to the present case, the alleged trademark "use" of the generic term "intel" is completely non-competitive. The parties, even upon a plain reading of the facts alleged in the Complaint, do not compete or operate in the same marketing channels. The use of dictionary and other standard or reference- work definitions to ascertain that the word being used by the defendant is not the same word that constitutes plaintiff's trademark is

particularly appropriate.

Having established the legal basis for the Court to consider such definitions, consideration of the extensive body of references set forth in the Statement of Facts to use of the word "intel" in the manner used by defendants, and completely unrelated to plaintiff's trademarks or its business, easily demonstrates the meritless nature of the Complaint.

### C. First and Second Cause of Action claims both fail "ultimate test"

To state a claim for infringement of a registered trademark, a plaintiff must plausibly allege that (1) it owns a registered trademark; (2) its use of that mark began before the defendant's use; (3) the defendant's use is without the plaintiff's consent; and (4) the defendant's use is likely to cause confusion, or to cause mistake, or to deceive. See *15 U.S.C. § 1114(a)*; *Century 21 Real Estate v. Sandlin*, 846 F.2d 1175, 1178 (9th Cir. 1998). The elements of a false designation of origin claim under 15 U.S.C. § 1125(a) are identical, with the exception that the plaintiff's trademark need not be registered. See 15 U.S.C. § 1125(a). Both claims are subject to the same "ultimate test": "whether the public is likely to be deceived or confused by the similarity of the marks." *Century 21*, 846 F.2d at 1178; see also *Jada Toys, Inc. v. Mattel, Inc.*, 518 F.3d

628, 632 (9th Cir. 2008). The "confusion must be probable, not simply a possibility." *Murray v. Cable Nat. Broadcasting Co.*, 86 F.3d 858, 861 (9th Cir. 1996). Plaintiff has failed to state a trademark infringement claim for two reasons. First, Intel has failed to plausibly allege that Defendant has "used" the INTEL trademark. The facts alleged in Intel's Complaint establish that Defendant's product name and trademarks use the word "intel" in its generic or common sense, i.e., as a synonym for information regarding customer relationship management software for use by insurance agencies, not as a reference to the INTEL mark. *Complaint* ¶ *12-24.* Secondly, Intel has failed to allege that its use of the term "intel" is likely to deceive or confuse the public.

Where a defendant uses a word "for its literal dictionary definition," the defendant cannot be held liable for trademark infringement. See *Visa Int'l Serv. Ass'n v. JSL Corp*., 2010 WL 2559003 at * 3 (9th Cir. 2009); see also *New Kids on the Block v. News America Publ'g, Inc.*, 971 F.2d 302, 306 (9th Cir. 1992) (noting that "generic words" are not protectable). This rule "allays fears that producers will deplete the stock of useful words by asserting exclusive rights in them." *New Kids on the Block*, 971 F.2d at 306. Nowhere in the Complaint does Intel allege that it offers any product or service remotely related to a CRM platform, and more specifically, one tailored to the narrow market of the

insurance agency industry.

Conversely, Defendant Intruity provides "information": and "analysis" related to the operations and efficiencies of the insurance industry and the components required to run an insurance agency. Thus, INTRUITY CORPORATION's use of the term of "intel" appears to be consistent with the term's common meaning. The allegations contained within Intel's Complaint simply do not support a plausible claim that INTRUITY CORPORATION chose to use the term "intel" for any other reason but to describe the functions within the software that provide tactical advantages when running an insurance agency.

Secondly, Intel's infringement claims fail because the company has not adequately alleged that INTRUITY CORPORATION's use of "intel" is likely to cause confusion among INTRUITY CORPORATION's potential customers regarding the source of INTRUITY CORPORATION's services. In determining whether confusion between goods and services is likely, the Court must considers eight factors: (1) strength of the mark; (2) relatedness of the goods and services; (3) similarity of the marks; (4) evidence of actual confusion; (5) marketing channel used; (6) type of goods and the degree of care

likely to be exercised by the purchaser; (7) the defendant's intent in selecting the mark; and (8) likelihood of expansion of the product lines. *AMF, Inc. v. Sleekcraft Boats*, *599 F.3d 341*, *349* (9th Cir. 1979).

Intel has failed to allege facts sufficient to support a plausible finding that its services are closely related to INTRUITY CORPORATION's services. Specifically, Intel asserts that provides a wide assortment of products and services under its INTEL mark to *enable and improve software as a service*, including solutions that optimize data storage and analysis for many industries, including to but not limited to insurance agencies. *Complaint* ¶ *3-11* This broad statement is an insufficient basis to establish a close proximity of products between the Plaintiff and Defendant. Alleging that it offers "solutions" for data optimization and does not even create any nexus to a comprehensive software program that provides strategic optimization of the functions required to run an insurance agency. No allegations have been made that Defendant targets any of the same customers as Intel or that INTRUITY CORPORATION's actual customers substantially overlap with Intel's actual customers.").

With respect to the fourth factor, Intel does not allege that there has been

any actual confusion among its current or potential customers. This factor therefore does not support its infringement claim. Intel has not alleged that it uses the same marketing channels as INTRUITY CORPORATION to market its product. In sum, even assuming Intel's allegations are true, nearly all the Sleekcraft factors weigh in favor of a finding that no customer confusion is likely.

### D. Defendant's of the word "intel" in its plain English sense is not use of the INTEL trademark

Plaintiff has pleaded a number of claims sounding in trademark infringement but based on different legal theories, which are all alternative conceptual approaches to capturing—in a legally cognizable way—a person's wrongful use of another's trademark and either confusing the public, or undermining, by dilution, the trademark holder's ability to benefit from his mark. All are premised on wrongful use of the trademark in question. Not only are defendant's actions not even remotely likely to cause confusion or mislead consumers—as will be discussed in the following section— but, even more fundamentally, the INTEL trademark has never been used by the defendant, even though it has used the unrelated English word "intel."

All these legal theories ultimately reflect the policy embodied in the

federal Lanham Act, which imposes liability upon any person who (1) uses an infringing mark in interstate commerce, (2) in connection with the sale or advertising of goods or services, and (3) such use is likely to cause confusion or mislead consumers. 15 U.S.C. § 1114(1)(a). The first and most fundamental prong of a claim for trademark infringement or trademark dilution, therefore, is that a plaintiff must allege that the defendant actually used its trademark. See *Academy of Motion Picture Arts and Sciences v. Network Solutions*, 989 F. Supp. 1276, 1279-81 (C.D. Cal. 1997) (federal trademark infringement and dilution claims and state law unfair competition claims require that defendant "used" another's mark without permission in connection with its own goods and services); *Toho Co. v. Sears, Roebuck & Co.*, 645 F.2d 788, 793 (9th Cir. 1981) (dilution doctrine codified in Business and Professions Code protects trademark holder from harm due to defendant's "use" of its mark); *Sunset House Distributing Corp. v. Coffee Dan's Inc.*, 240 Cal. App. 2d 748, 753 (1966) (state law trademark infringement and unfair competition claims require defendant's "use of a confusingly similar tradename" to tradename used by plaintiff); *15 U.S.C. § 1125(a)(1)* (false representation actionable under Lanham Act if party "uses in commerce" a "false or misleading representation of fact").

But the courts have long made it clear that not all "uses" of a trademark

are actionable. Trademarks "identify and distinguish" goods "from those manufactured or sold by others" and "indicate the source of the goods." *15 U.S.C. § 1127*; *New Kids on the Block v. News America Publ'g, Inc.*, 971 F.2d 302, 305 (9th Cir. 1992). Trademark rights—as was perhaps best stated by Justice Holmes—only enable their owner to prohibit the use of that trademark "so far as to protect the owner's good will against the sale of another's product as his." *Prestonettes, Inc. v. Coty*, 264 U.S. 359, 368 (1924) (Holmes, J.). In contrast, "[i]f defendants are only using [plaintiff's] trademark in a 'non-trademark' way—that is, in a way that does not identify the source of a product—then trademark infringement and false designation of origin laws do not apply." *Interactive Prods. Corp. v. a2z Mobile Office Solutions, Inc.*, 326 F.3d 687, 695 (6th Cir. 2003); see also *Academy of Motion Picture Arts and Sciences v. Network Solutions*, 989 F. Supp. 1276 at 1279 (C.D. Cal. 1997) ("commercial use" under Lanham Act requires that defendant attach marks to goods or services that it sells); *Pirone v. MacMillan, Inc.*, 894 F.2d 579, 583 (2d Cir. 1990) (a defendant "can infringe [a trademark owner's] rights only if [the defendant's] use was a 'trademark use,' that is, one indicating source or origin").

In the present matter, it is beyond dispute that defendants are using the

word "intel," which is spelled and pronounced exactly as the INTEL trademark. Furthermore, defendant is making, in the strict sense, trademark use of the word "intel" as part of the two word combination used to describe their software program. Defendant is not making use of the trademark INTEL which, while the complaint attempts to distract matters by claims that it is "ubiquitous" (Complaint ¶ 10) and in use "with virtually every product and service it sells" (Complaint ¶ 12), is ultimately associated only with the famous, wealthy company that "develops, manufactures and sells a wide variety of computer, communications and Internet-related products and services"—but not news and information. Not "intelligence." Not "intel." This is not trademark use.

**E. Any use by defendant's of plaintiff's mark is an example of a non-actionable generic meaning in different contexts**

Despite the deference afforded registered trademarks, much less incontestable and famous ones, the cases have not hesitated to give short shrift to plaintiffs, such as Intel, that seek to control the development of language and culture merely because they own a bona fide stake in a particular combination of letters in the Latin alphabet. Indeed, the Ninth Circuit has ruled this way even when the association—even the genesis of the junior user—is in fact obvious, yet consumer associations are not:

> The First Amendment may offer little protection for a competitor who labels its commercial good with a confusingly similar mark, but "[t]rademark rights do not entitle the owner to quash an unauthorized use of the mark by another who is communicating ideas or expressing points of view." *L.L. Bean, Inc. v. Drake Publishers, Inc.*, 811 F.2d 26, 29 (1st Cir.1987). Were we to ignore the expressive value that some marks assume, trademark rights would grow to encroach upon the zone protected by the First Amendment. See *Yankee Publ'g, Inc. v. News Am. Publ'g, Inc.*, 809 F.Supp. 267, 276 (S.D.N.Y.1992) ("[W]hen unauthorized use of another's mark is part of a communicative message and not a source identifier, the First Amendment is implicated in opposition to the trademark right."). Simply put, the trademark owner does not have the right to control public discourse whenever the public imbues his mark with a meaning beyond its source-identifying function. See *Anti- Monopoly, Inc. v. Gen. Mills Fun Group*, 611 F.2d 296, 301 (9th Cir.1979) ("It is the source-denoting function which trademark laws protect, and nothing more.").

*Mattel, Inc. v. MCA Records, Inc.*, 296 F.3d 894, 900-901 (9th Cir. 2002) (no trademark infringement in BARBIE trademark for dolls arising from performance of "Barbie Girl" song).

Professor McCarthy, in his definitive treatise, addresses this topic under the rubric of "generic meanings in different contexts." His analysis of the black-letter law on this topic is precisely on point. And while the following excerpt is somewhat extended, defendant respectfully submits that the Court indulge its inclusion, for in this passage McCarthy comprehensively and authoritatively addresses—and demolishes—the specious trademark / unfair

competition issue in this litigation:

> Sometimes a word used as a trademark comes to have an entirely new “generic” meaning or usage apart from its function as a trademark. This occurrence has been described as “the parallel development of new dictionary meanings in the everyday give and take of human discourse.” In one such case, a federal court refused to enjoin public interest groups from referring to the “Strategic Defense Initiative” as the “Star Wars Program” in television media, over the objection of the owner of the STAR WARS motion picture trademark. The court reasoned that:
>
>> [T]he use of star wars in political propaganda, newspapers or noncommercial, non-trade references will not undermine plaintiff's exclusive property right to use in connection with goods and services. ... Now the phrase star wars has acquired a double meaning ... The new meaning of the phrase in the political context or scientific context does not affect the distinct, and still strong secondary meaning of STAR WARS in trade and entertainment.
>
> This policy of allowing parallel “generic” use of a trademark in a different context acknowledges the dynamic nature of modern language: the meaning of a word or symbol is not necessarily fixed for all time as it is first used, or as it is defined in the dictionary, but may grow and develop new meaning and nuances according to its use. Although a word may have developed a new, generic meaning in a non-commercial, non-trade context, as long as it still functions in the commercial context to identify the good will of its source, it has meaning as a trademark and that meaning will be judicially protected against confusingly similar commercial use. Thus, while the terms “Mickey Mouse” or “Teflon” president may have acquired new, “generic” meanings in the language, that does not impugn their original status as strong trademarks in the commercial context. Similarly, the trademark SPAM for canned meat took on a new and parallel meaning in the language as denoting unwanted or “junk” advertising e-mail. "[T]he trademark owner does not have the right to control public discourse whenever the public imbues his mark with a meaning beyond its source-identifying function."

> Somewhat similar is the case where the Illinois High School Association for several decades named the state high school basketball tournament "March Madness," and, years later, television sports broadcasters began calling the N.C.A.A.'s national college basketball tournament "March Madness." The court refused the high school association's plea to enjoin the N.C.A.A.'s use of the term "March Madness" and its licensing of the term for computer games. The court said that principles of free speech prevent a court from prohibiting the media from calling the N.C.A.A. tournament "March Madness" and a court could not stop the public from affixing the name to something other than the Illinois high school tournament. To centralize ownership, the two parties then assigned their trademarks to a new entity which licensed back both of the parties to use the term to identify their basketball tournaments. The new entity then prevailed in asserting infringement against a third party user.
>
> A term may be the generic name of one product, but not of another. For example, while DIESEL is not the generic name of wearing apparel, the owner of that mark for wearing apparel cannot prevent a maker of diesel engines from using the word to name its products. Thus, some cases can be decided on the ground that the defendant's use is permitted because the contested term is a generic name of the defendant's goods, without the court having to pass on the validity of the mark and its genericness as to the plaintiff's goods. . . .

*McCarthy § 12:3* (citing *Lucasfilm, Ltd. v. High Frontier*, 622 F. Supp. 931, 969 (D.D.C. 1985); *Viacom International Inc. v. Komm*, 46 U.S.P.Q.2d 1233 (T.T.A.B. February 05, 1998) (MY-T-MOUSE software not an infringement of MIGHTY MOUSE cartoon character even though merchandised for use on toys, which could include computer toys and games); *56 INTA Bulletin, no. 14 p.1* (Aug. 1, 2001) (Hormel Foods "spam" litigation); *Mattel, Inc. v. MCA*

*Records, Inc.*, 296 F.3d 894 (9th Cir. 2002), cert. denied, 537 U.S. 1171 (2003) ("Some trademarks enter our public discourse and become an integral part of our vocabulary."); *Illinois High School Ass'n v. GTE Vantage, Inc.*, 99 F.3d 244 (7th Cir. 1996) ("[A] court could not, without violating the free speech clause of the First Amendment, have enjoined (or used other legal remedies to prevent or deter) the media from calling the NCAA tournament 'March Madness' . . . [W]e think that for the sake of protecting effective communication [the issue] should be resolved against trademark protection, thus assimilating dual use of multiple use terms to generic terms."); *March Madness Athletic Ass 'n, L.L.C. v. Netfire, Inc.*, 310 F. Supp. 2d 786 (N.D. Tex. 2003), judgment entered, 2003 WL 22173299 (N.D. Tex. 2003) and aff'd, 120 Fed. Appx. 540 (5th Cir. 2005)).

Every one of these cases involved a junior use whose "inspiration" or allusion to the trademark in question was beyond cavil, but was still found to be permissible as a generic meaning in a different context. The trademark rights did not follow, as they cannot, the change in meaning.

In contrast, the defendant's position is far stronger than in the aforementioned cases, where the infringement claims still failed. In contrast, there has been no change or "genericization" of the trademark. The generic

word used by the defendant—“intel”—bears no conceptual, commercial, or semantic relationship to the trademark INTEL besides a common root in the word “intelligence.” The government officials, journalists and pundits quoted using the English term “intel” for “intelligence information” were obviously not referring to, much less using, the INTEL trademark. And neither can the same use of the same term in the same way by defendant plausibly be alleged to constitute trademark infringement.

### F. Plaintiff has failed adequately to plead facts amounting to a plausible claim of likelihood of confusion.

As the Trademark Trial and Appeal Board (TTAB) wrote in *Viacom International Inc. v. Komm,* 46 U.S.P.Q.2d 1233 (T.T.A.B. February 05, 1998), “[t]his brings us to the issue of likelihood of confusion.” In determining whether confusion between related goods is likely, the Ninth Circuit considers eight factors: (1) strength of the mark; (2) relatedness of the goods and services; (3) similarity of the marks; (4) evidence of actual confusion; (5) marketing channel used; (6) type of goods and the degree of care likely to be exercised by the purchaser; (7) the defendant's intent in selecting the mark; and (8) likelihood of expansion of the product lines. *AMF, Inc. v. Sleekcraft Boats*, 599 F.3d 341, 349 (9th Cir. 1979). The Complaint fails, here, on multiple scores.

First, there is no plausible relation between the goods and services of plaintiff and defendant. Second, the uses of the word “intel” by defendant, even if those uses are construed by the Court as legally cognizable uses of the INTEL mark, and even if they are not deemed fair uses, they are not confusingly similar to the INTEL trademarks because they are not similar to the INTEL trademark; rather, they are embedded in longer, multi-word phrases of which “intel” is only a component of the phrase. Third, there is no allegation of actual confusion. Fourth, the types of goods and the marketing channels for these goods are entirely disparate—there is no plausible allegation here that a prospective customer interested in any service provided by plaintiff would choose or even consider defendant’s offerings instead. Fifth, there is not even a plausible allegation that plaintiff is going into the business of Customer Relations Software or managing insurance-related analysis and “intel” in any form. Most of these facts are self-evident; defendant analyzes some of the relevant legal principles below.

***i. Defendant’s of the word “intel” as part of various longer phrases is not likely to be confused with the INTEL trademark***

According to the “anti-dissection” rule, “[t]he commercial impression of a trademark is derived from it as a whole, not from its elements separated and

considered in detail." *Estate of P.D. Beckwith, Inc. v. Comm'r of Patents*, 252 U.S. 538, 545-46, 40 S.Ct. 414, 64 L.Ed. 705 (1920); *4 J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition § 23:41* (4th ed.2004) ("McCarthy"). As the Ninth Circuit has taught:

> [When a] mark is a composite term . . . its validity is not judged by an examination of its parts. Rather, the validity of a trademark is to be determined by viewing the trademark as a whole. See *Carbide Corp. v. Ever-Ready Inc.*, 531 F.2d 366, 379 (7th Cir. 1976), cert. denied, 429 U.S. 830, 97 S.Ct. 91, 50 L.Ed.2d 94 (1976). "Words which could not individually become a trademark may become one when taken together." Id. "A composite geographical mark should not be dissected into its parts . . . It is the likely reaction of customers to the total mark that is at issue." *1 J. McCarthy*, supra, § 14:6, at 496 . . .

*California Cooler, Inc. v. Loretto Winery, Ltd.*, 774 F.2d 1451, 1455 (9th Cir. 1985).

Plaintiff's trademark claim is based on the use by defendant of the word "intel" in the product name AGENCYINTEL. This phrases is not confusingly similar either to the INTEL mark itself, nor to any of the multi-word marks alleged by plaintiff and cannot plausibly be likely to be confused with defendant's marks.

***ii. Defendant's use of the word "intel" is not likely to be confused with the INTEL trademark because it is used with completely different product.***

"Even where there is precise identity of a complainant's and an alleged

infringer's mark, there may be no consumer confusion—and thus no trademark infringement—if the alleged infringer is in a different geographic area or in a wholly different industry." *Brookfield Communications, Inc. v. West Coast Entertainment Corp.*, 174 F.3d 1036, 1054-56 (9th Cir. 1999) ("If, on the other hand, Brookfield and West Coast did not compete to any extent whatsoever, the likelihood of confusion would probably be remote"). Here geography is irrelevant, but surely the disconnection between the parties' different businesses is more than sufficient to deem the Complaint's claim of a likelihood of confusion implausible.

In Viacom, for example, the TTAB was easily able to distinguish between the rights of Viacom in the MIGHTY MOUSE trademarks and the software at issue in that opposition proceeding based on a record indicating that despite the virtual identity of the trademarks in question as a matter of law—MIGHTY MOUSE and MY-T-MOUSE—consumers simply would not confuse the animated rodent superhero with software to enhance the performance of a computer mouse, even where (unlike here) it was obvious that former was meant as an allusion to the latter. Where, as here, the Complaint itself makes it clear that there is no coherent connection between the goods and services offered by the plaintiff and those of the defendant, it is entirely proper

for a court to dismiss trademark claims for failure to plead a plausible case of likelihood of confusion at the pleadings stage:

> A likelihood of confusion exists when a consumer viewing a service mark is likely to purchase the services under a mistaken belief that the services are, or associated with, the services of another provider. *Rodeo Collection, Ltd. v. West Seventh*, 812 F.2d 1215, 1217 (9th Cir.1987). The confusion must "be probable, not simply a possibility." *Id.* If goods or services are totally unrelated, there is no infringement because confusion is unlikely. *AMF, Inc. v. Sleekcraft Boats*, 599 F.3d 341,348 (9th Cir. 1979).

*Murray v. Cable Nat. Broadcasting Co.*, 86 F.3d 858, 861 (9th Cir. 1996) (rejecting suggestion that 12(b)(6) relief unavailable in Lanham Act cases on likelihood of confusion grounds). Similarly, no plausible likelihood of confusion has been pleaded. And while Viacom was procedurally distinguishable from this case, the TTAB's argument for rejecting a claim of likelihood of confusion is completely applicable here; all the Court needs to know perform the same analysis is indeed contained in the Complaint.

The defendant here sells a CRM software product offering "intel" or intelligence information, about insurance agency operations by providing Agency Management, Customer Relationship data, commissions tracking and calculation, reports and analytics regarding production data, policy summaries, call performance and commission tracking, and a Lead management system. On

the other hand, plaintiff sells computer chips and related goods and services. Indeed, as paragraph 8 of the Complaint states, plaintiff, in part asserts infringement on the ground that it is used the INTEL mark in "a wide variety of computer, hardware, sortware, online services, and software development services", none of which is related or focused on the management of an insurance agency. They have crafted their complaint to state that plaintiff's business is in Computers . . . communications . . . Internet . . . exactly the business of defendant! But any suggestion by Intel Corporation that it in competes with defendant at all is preposterous, and falls far short of the plausibility standard of Rule 12(b)(6). INTEL is not, and cannot be, alleged to be a trademark used in connection with insurance agency office management, even though that system is a software product that is used via the Internet from computer to computer. This would, after all, apply to virtually all modern commerce, communication, and human intercourse in almost the whole world. Indeed, as an initial matter, the TTAB was not at all impressed, as this Court should not be, with broad claims by a trademark owner that its mark is all about "the Internet," and that "the Internet" is all about absolutely anything:

> The mere fact that computer accessories and computer toys and games involve the use of computers or software, and that applicants' goods are also computer software, does not, in and of

> itself, demonstrate that the computer software on which applicants use their mark is within the natural scope of expansion of the use of opposer's mark. As we have said in the context of determining whether products are related, "Given the ubiquitous use of computers in all aspects of business in the United States today, this Board and its reviewing Court have rejected the view that a relationship exists between goods and services simply because each involves the use of computers." *Electronic Data Systems Corp. v. EDSA Micro Corp.*, 23 USPQ2d 1460, 1463 (TTAB 1992). See also *Octocom Systems, Inc. v. Houston Computers Services Inc.*, 918 F.2d 937, 16 USPQ2d 1783 (Fed. Cir. 1990); *Information Resources Inc. v. X*Press Information Services*, 6 USPQ2d 1034 (TTAB 1988). . . .

*Id.* Plaintiff's "wide variety of computer, communications and Internet-related products and services" allegation proves too much, and helps the Court focus on the paucity of allegations that could amount to a substantive basis to find that likelihood of confusion had been pleaded here.

Indeed, and again in Viacom, after brushing away the "Internet and computers" distractions, the TTAB relied, in finding that there was no likelihood of confusion, on a far more fundamental fact. In short, the two trademarks existed in completely different conceptual "spaces"—just as the INTEL trademark associated with computer chips are plainly not be likely, and cannot plausibly be alleged as likely, to be confused with regional or strategic "intel" delivered via a newsletter or blog:

> Moreover, the marks have different connotations, in that

> applicants' mark is actually used in connection with the computer peripheral known as a "mouse," and this meaning is further emphasized by the informational language in the mark, THE SOFTWARE THAT MAKES YOUR MOUSE A MOUSE THAT TYPES. Thus, it is the connotation of the computer accessory, rather than of the cartoon animal associated with opposer's mark, that consumers will perceive.

*Viacom*, 46 U.S.P.Q.2d 1233, 1998 WL 177472. Computer mouses are not cartoon mice, just as INTEL chips and their "related goods and services" could never, in the mind of a consumer, plausibly be alleged to connote insurance agency management software.

**G. The fame of defendant's mark does not enhance the plausibility of its allegations of a likelihood of confusion because defendant's use of the word "intel" is not a "competing mark"**

Finally, there is the matter of fame, which, while not the same as "strength" in trademark terms, is an issue in a trademark case such as this one. Indeed "a mark's fame creates an incentive for competitors "to tread closely on the heels of a very successful trademark," and "[a] strong mark . . . casts a long shadow which competitors must avoid." K*enner Parker Toys Inc. v. Rose Art Industries, Inc.*, 963 F.2d 350, 353 (Fed. Cir. 1992). For this reason, "the Lanham Act's tolerance for similarity between competing marks varies inversely with the fame of the prior mark. As a mark's fame increases, the Act's tolerance for similarities in competing marks falls." *Id.* But these considerations

are relevant only to competing goods and services, which it cannot plausibly alleged are implicated by this Complaint. In *Viacom*, the TTAB set out an important lesson for those who are unduly impressed with the fame of a trademark and who assert, or believe, that the owner of a famous trademark is entitled, per se, to own or control every manifestation of some version of it that might occur in common parlance:

> We acknowledge that applicants' mark MY-T-MOUSE and design might bring to mind the cartoon MIGHTY MOUSE. However, this does not necessarily mean that consumers will be confused into believing that the two marks indicate the same source of origin. See *Jacobs v. International Multifoods Corp*., 668 F.2d 1234, 212 USPQ 641, 642 (CCPA 1982) (the fact that one mark may bring another to mind does not in itself establish likelihood of confusion as to source). See also, *Original Appalachian Artworks Inc. v. Streeter*, 3 USPQ2d 1717 (TTAB 1987) As the Court stated in *University of Notre Dame du Lac v. J. C. Gourmet Food Imports Co., Inc.*, 703 F.2d 1372, 217 USPQ 505 (Fed. Cir. 1983):
>
>> likely * * * to cause confusion means more than the likelihood that the public will recall a famous mark on seeing the same mark used by another. It must also be established that there is a reasonable basis for the public to attribute the particular product or service of another to the source of the goods or services associated with the famous mark. To hold otherwise would result in recognizing a right in gross, which is contrary to principles of trademark law and to concept embodied in 15 USC Section 1052(d).
>
> Thus, even in the case of a famous mark (and, as we have stated, on this record MIGHTY MOUSE does not rise to the level of a famous mark), the mere fact that the junior user's mark may remind the public of the famous mark does not mean that the use of the junior mark is likely to cause confusion. For the reasons given above, we find that consumers will distinguish between the parties'

> marks, and are not likely to believe that applicants' identified software, sold under the MY-T-MOUSE and design mark, emanates from or is sponsored by the same source as the MIGHTY MOUSE cartoon character.

Here, too, it cannot plausibly be alleged that consumers wanting to improve their insurance agency, encountering a CRM software utilizing the mark AGENCYTINTEL would possibly think they emanate from or are sponsored by computer-chip maker Intel Corporation.

### H. Plaintiff has failed to state a claim that defendant's use of the word "intel" is likely to dilute its INTEL mark

To prevail on its dilution by blurring claim (Complaint ¶ 39-43), plaintiff has the burden of proving by a preponderance of evidence: (a) that it is the owner of a trademark that is famous; (b) that the famous mark is distinctive, either inherently or through acquired distinctiveness; (c) that defendant is making or has made use in commerce of an identical or nearly identical trademark; (d) that defendant's use of the INTEL mark began after it became famous; and (e) that defendant's use of the word "intel" as part of its product name, AGENCYINEL mark is likely to cause dilution by blurring of the INTEL trademark. 15 U.S.C. § 1125(c); *Jada Toys, Inc. v. Mattel, Inc.*, 518 F.3d 628, 634 (9th Cir. 2008).

As set forth above, plaintiff cannot establish all these elements. The first

two elements as well as the fourth are not at issue, but it is clear that defendant is not making and has not made use in commerce of an identical or nearly identical trademark to INTEL by its own use of the English word "intel" in the mark AGENCYINTEL. These are simply not identical, or nearly identical, trademark uses. Intel's dilution claim fails because INTRUITY CORPORATION is using the term "intel" in its generic sense. Intel's dilution claim, like its infringement claim, is not cognizable. See *Visa Int'l, 2010 WL 2559003, at *3* (noting that use of a word "for its literal dictionary definition" is not actionable).

In sum, the Complaint similarly fails as to the likelihood of causing dilution by blurring. "Dilution by blurring" is association arising from the similarity between a mark or trade name and a famous mark that impairs the distinctiveness of the famous mark. *15 U.S.C. § 1125(c)(2)(B)*. But while the INTEL mark remains distinctive in its own right, the word "intel" has its own meaning, is in widespread—indeed, nearly universal—use that has no connection to Intel Corporation or its business, and is either properly considered a separate word or "mark" from the plaintiff's INTEL mark or, by virtue of its use as a word, a clear indication that the distinctiveness that plaintiff claims for its mark is long gone, and that defendant's actions have nothing at all to due with that.

## CLAIMS 4 AND 5: STATE LAW CLAIMS

Intel's Florida state law dilution, and unfair competition claims are subject to the same tests as its federal claims. See *Jada Toys, 518 F.3d at 631 n.1, 632, 634*.

## CONCLUSION

Accordingly, for all of the foregoing reasons, this Court should grant defendants' Motion to Dismiss the Complaint. As no amount of re-pleading can overcome the fact that defendants are utilizing the term 'intel' in a non-actionable and generic meaning, said dismissal should be with prejudice.

Respectfully submitted,

Dated: March 10, 2017

By: /s/ Steven K. Teuber
Steven K. Teuber
Florida Bar No. 14790
Attorney for Defendant Intruity Corporation

Teuber Law, Pllc
1375 Jackson Street, Suite 201
Fort Myers, FL 33901
(239) 288-4210 TEL
(239) 288-4211 FAX
steuber@teuberlaw.com